# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 20-2033V

| | |
|---|---|
| THOMAS GOTHERS,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: August 15, 2023<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Onset;  Influenza<br>(Flu) Vaccine; Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Timothy J. Mason, Law Office of Sylvia Chin-Caplan, LLC, Boston, MA, for Petitioner.*

*Tyler King, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On December 30, 2020, Thomas Gothers filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine he received on October 1, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons discussed below, I find that Petitioner's Table SIRVA claim must be dismissed because the evidentiary record does not support the conclusion that the

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

requisite onset of his pain occurred within 48 hours following administration of the flu vaccine. This leaves a possible causation-in-fact claim to be adjudicated – but the matter will only be transferred if Petitioner can show cause how such a claim might succeed, given the weak onset evidence.

I.      **Relevant Procedural History**

On October 24, 2022, about 21 months after the case was initiated, Respondent filed a Rule 4(c) Report arguing that Petitioner could not establish that his pain began within 48 hours of his vaccination, primarily because he "had eight contacts with a health professional for various issues . . . yet he never mentioned left shoulder symptoms," and therefore the claim should be dismissed. ECF No. 48 at 7.

On January 20, 2023, Petitioner filed a supplemental affidavit along with his brief on the issue of onset ("Br.") ECF No. 42-43. On March 1, 2023, Respondent filed a response brief ("Resp.") and on March 8, 2023, Petitioner filed a reply to Respondent's response ("Repl."). ECF No. 44-45. The issue of onset is now ripe for a fact ruling.

II.     **Issue**

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

III.    **Authority**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-

1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical

records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.    Finding of Fact

I make the following findings after a complete review of the record, including all medical records and affidavits, the arguments in Respondent's Rule 4(c) Report, and the arguments in the parties' briefs. I find the following points to be particularly relevant:

- Petitioner received a flu shot in his left arm on October 1, 2019. Ex. 1 at 33. Petitioner's medical records reveal prior no injuries to, or medical issues with, his left shoulder or arm. *See generally*, Ex. 1-2.

- Petitioner has averred that he "started feeling pain in [his] left shoulder and upper arm immediately after [his] flu shot." Ex. 11 at ¶4.

- Petitioner's wife has both education and vocational training in administering intramuscular vaccinations. Ex. 9 at 3. At a previous job, her responsibilities included administering intramuscular vaccinations. *Id*.

- Petitioner's wife maintains that Petitioner first told her about his left shoulder pain the day after his flu shot in October 2019. Ex. 9 at ¶4-5. She "noticed that the band-aid on his shoulder was higher than [she] would have expected based on her training." *Id*. at ¶5. She recalled that Petitioner asked her about his shoulder and that she "suggested that it might take him about three months to get better too if his shot hit a bone." *Id*. at ¶7.

- Petitioner visited his optometrist several times within a month of the vaccination – on October 18, October 24, October 29, and November 13, 2019. Ex. 1 at 35-47. The records of those visits do not reflect any complaints of left shoulder pain.

- Petitioner further represents that his pain continued "throughout that fall" of 2019 and caused problems with activities of daily living ("ADLs"), with his work, and with recreational activities. Ex. 11 at ¶5-6. He attempted to self-treat his shoulder pain with a massage ball and adapting his activities. *Id*. Petitioner's wife recalled that he "found some exercises and stretches online that he thought would help" his pain. Ex. 9 at ¶8.

- There is a subsequent two-month records gap, with no evidence of further treatment of any kind in 2019. Petitioner presented to his chiropractor on

January 14, January 28, February 6, February 18, and February 27, 2020, however, for treatment on his ankles relating to a May 2019 surgery. Ex. 3 at 8-10. The records of those visits do not reflect any reports of left shoulder pain.

- Petitioner first sought medical treatment for his left shoulder pain from his PCP on March 2, 2020 - 153 days, or five months after his vaccination. Ex. 1 at 47. The record notes that he was last seen on 10/01/2019 for an upper respiratory infection and flu vaccine. *Id*. He now reported left deltoid pain that "started in 12/2019 after receiving the flu shot." *Id*. On exam, Petitioner had reduced range of motion and tenderness with palpation. *Id*. at 50-51. Petitioner was encouraged to be evaluated by physical therapy and sports medicine specialists and to use ice, heat, and over-the-counter medications for pain. *Id*. at 51.

- Petitioner presented to an orthopedist on March 30, 2020. Ex. 5 at 30. Petitioner reported "five months of left shoulder pain" that "began after he got a flu shot in the fall." *Id*. Dr. Zilberfarb assessed that Petitioner "most likely has a flu-shot induced left shoulder bursitis." *Id*. He administered a cortisone injection and referred Petitioner to physical therapy. *Id*.

- On April 10, 2020, Petitioner presented for an initial physical therapy evaluation. Ex. 2 at 37. He reported left shoulder pain "since Oct 2019 after getting a flu shot." *Id*. The physical therapist recorded that Petitioner "thinks it was from flu injection that went into the bursa Oct 5th 2019." *Id*. The physical therapist noted that Petitioner had talked to his chiropractor about his pain. *Id*. Petitioner recalled discussing his shoulder pain with his chiropractor "at some point" and that his chiropractor told him about SIRVA injuries. Ex. 12 at ¶5.

- On June 13, 2020, Petitioner returned to his chiropractor for treatment for his left shoulder pain. Ex. 3 at 25. The chiropractor recorded that Petitioner's pain "gradually began following a seasonal influenza vaccine." *Id*. Petitioner was assessed with "frozen shoulder contracture syndrome secondary to a shoulder injury related to vaccine administration (SIRVA) from his recent seasonal influenza vaccine vs. an occult labral tear or calcific tendinitis." *Id*. at 26.

- Petitioner presented to a sports medicine clinic on August 11, 2020. Ex. 4 at 9. He reported that his left shoulder symptoms began "after receiving a

flu shot on 10/5/2019." *Id*. Petitioner received an intra-articular corticosteroid injection. *Id*. at 10.

The length of time between the vaccination at issue and Petitioner's first report of left shoulder pain to a medical professional is highly problematic. I have previously noted that it is reasonable to expect that an average claimant "might seek medical treatment sooner if in fact the person was experiencing sudden post-vaccination pain." *Pitts v. Sec'y of Health & Human Servs.*, No. 18-1512V, 2020 WL 2959421, at *5 (Fed. Cl. Spec. Mstr. April 29, 2020). At the same time, however, there are a variety of reasonable explanations for why a claimant might delay treatment – and thus delay does not automatically preclude a Table onset finding. As with all cases, the balance of facts can tip one way or another.

Here, it is undisputed that Petitioner waited five months – from October 1, 2019 to March 2, 2020 – before seeking treatment for his left shoulder pain. Ex. 1 at 33, 47. Moreover (and discounting the optometrist visits, since they would not provide an occasion to discuss other bodily issues), Petitioner was also presented with reasonable opportunities in early 2020 to report his shoulder pain, when he visited his chiropractor, but did not. *See* Ex. 3 at 8-10. Petitioner has attempted to explain this omission, reporting that he "only visited Dr. Puri for one specific issue at a time," and that the visits in early 2020 were "focused on [his] ankle concerns." Ex. 12 at ¶4. However, he later recalled "bringing up [his] shoulder pain to Dr. Puri during his treatment of [his] ankle out of pure frustration with [his] symptoms." *Id*. at ¶5. Notably, Petitioner also recalled talking to Dr. Puri *after* he had already seen his PCP for his shoulder pain. *Id*. Although not dispositive alone, Petitioner's failure to mention left shoulder pain to his chiropractor, who had treated him for at least three years at that time for both lower back and ankle pain, undermines Petitioner's statements of immediate and lasting pain that significantly interfered with daily activities. *See e.g.,* Ex. 3 at 23.

Mr. Gothers has attempted to explain his delay, and some of his justifications are reasonable. For example, he maintains that he initially believed his pain was normal. Ex. 11 at ¶4. When the pain persisted, he consulted his wife, who had medical education and training. *Id*. In response, his wife opined that improvement could take "around three months." Ex. 9 at ¶7. During that time, Petitioner attempted self-care, including adapting his activities, both at work and home, using a massage ball, and doing exercises he found online. Ex. 11 at ¶5-7; Ex. 9 at ¶8. Petitioner's wife also noted that Petitioner has a "high tolerance for pain" and did not seek medical care in previous situations when he was injured. Ex. 9 at ¶6. Petitioner noted that he finally sought care at his wife's urging when the pain became unbearable and would "stop [him] in his tracks." Ex. 11 at ¶8; Ex. 9 at ¶9-10. These kinds of explanations merit some weight, especially when they supplement record omissions, rather than simply contradict outright record statements. *See, e.g.*, *Stevens v. Sec'y of Health & Human Servs*, No. 90-221, 1990 WL 608693, *3 (Fed. Cl.

Spec. Mstr. 1990) (noting that clear, cogent, and consistent testimony can overcome missing or contradictory medical records).

However, another issue with Table onset in this case is the fact that although record evidence establishes that Petitioner consistently attributed his shoulder pain to the October vaccination, those same records also consistently place onset as occurring more than 48 hours *after* vaccination. For example, when Petitioner first sought treatment for his left shoulder pain from his PCP on March 2, 2020 (Ex. 1 at 47), onset is recorded – in two separate places – as *December 2019*, or two months after vaccination. *Id*. at 47, 51. The record of that appointment also states that Petitioner's last visit was on October 1, 2019 – at which he received a flu shot - suggesting that the provider was aware of the correct date of vaccination during the visit, and thus somewhat bulwarking the conclusion that onset did not likely occur that close-in-time to vaccination. *Id*. at 47.

At Petitioner's next appointment for shoulder pain, on March 30, 2020, his orthopedist recorded "five months" of shoulder pain, now putting onset around the end of October 2019. Ex. 5 at 30. Then, at his first physical therapy appointment on April 10, 2020, Petitioner reported left shoulder pain "*after* getting a flu shot" on October 5, 2019. Ex. 2 at 37 (emphasis added). Petitioner reported the October 5, 2019 date again at the sports medicine clinic he visited on August 11, 2020. Ex. 4 at 9. Finally, Petitioner's chiropractor, who he had seen regularly for his ankle pain, recorded that Petitioner's pain began "gradually . . . following a seasonal influenza vaccine." Ex. 3 at 25. Thus, although Petitioner alleges Table onset, no records corroborate it cleanly.

Balancing all of the above, I find the evidence preponderantly weighs against a finding of Table onset. The delay itself in seeking treatment is unhelpful but not dispositive, and I give weight to Petitioner's explanations for why he avoided treatment. However, the lack of clear record support for 48-hour onset, *coupled* with delay, results in a finding against Petitioner on this matter.

My fact determination means that Petitioner's Table claim must be dismissed. A non-Table claim could be viable – but only outside of SPU. Moreover, because the facts in this case reveal *both* that Petitioner's onset was likely longer than a few days post-vaccination, and that his pain, even if immediate thereafter, was not consistent with the severity of a "true" SIRVA (since his delay does suggest he was able to tolerate it), Petitioner must show cause (with citation to other decisions) *how* he would articulate a causation-in-fact claim based on the present evidence. Only if Petitioner can show he might be able to succeed on a non-SIRVA shoulder injury claim will I allow the claim to be transferred for further development.

**Conclusion**

Because Petitioner has not preponderantly established that the onset of his shoulder pain occurred within 48 hours of vaccination, Table SIRVA claim must be dismissed. If Petitioner wishes to proceed with a non-Table claim, then on or before **Friday, September 29, 2023,** he shall show cause why such a claim might be viable, articulating his theory of recovery and citing to other Program decisions in which similarly-situated claimants have succeeded. Respondent shall thereafter be given the opportunity to oppose the response to the Order to Show Cause.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
